UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUSSELL MOYLE, ET AL.,

        Plaintiffs,

v.

COUNTY OF CONTRA COSTA, ET AL.,

        Defendants.

_____/

No. C-05-02324 JCS

**ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
AND GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
[Docket Nos. 35, 44]**

**I.     INTRODUCTION**

      Plaintiffs in this purported class action assert that Defendants' use of strip searches and visual body cavity searches in the County of Contra Costa's Juvenile Hall violates their federal constitutional rights under the Fourth and Fourteenth Amendments, as well as their right to privacy under article I, section 1, of the California Constitution, the California Unruh Civil Rights Act, the Bane Act (California Civil Code sections 52.1(a) & (b)), and California Penal Code section 4030.  In the Motion for Class Certification (the "Class Certification Motion"), Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure as to Plaintiffs' claims under the federal and California constitutions.[1]  Defendants oppose the motion for class certification and bring a motion seeking summary judgement (the "Summary Judgment Motion") on all of Plaintiffs' claims on a variety of grounds.

---

    [1]  Plaintiffs' counsel has stipulated that class certification is not being sought as to the claim asserted under Cal. Penal Code section 4030.  *See* Motion for Class Certification at 2, n.2 ("Plaintiff Ermitano does not seek to certify a class with respect to the claim for violation of California Penal Code Section 4030").

On Friday, October 26, 2007, at 9:30 a.m., Plaintiffs' Motion for Class Certification and Defendants' Motion for Summary Judgment came on for hearing. For the reasons stated below, the Class Certification Motion is GRANTED; the Summary Judgment Motion is GRANTED IN PART and DENIED IN PART.

## II.    BACKGROUND

### A.    First Amended Complaint[2]

In the First Amended Complaint ("FAC"), Plaintiffs allege that on May 25, 2005, Plaintiff Katherine Ermitano was "arrested and transported to Juvenile Hall in the County of Contra Costa, California, and there, prior to a detention hearing, was subjected to visual body cavity searches in violation of California Penal Code § 4030, the state constitution's guarantee of the right of privacy, the Fourth and Fourteenth Amendments to the United States Constitution and the Bane Act (Civil Code § 52.1)." FAC at 6. The FAC further alleges that Ermitano was subjected to these searches upon her return to the housing unit in Juvenile Hall "[e]ach and every time" she left for a court appearance or visits with her parents or lawyer, even though Defendants had "no reasonable suspicion that a strip or visual body cavity search of [Ermitano] would result in the discovery of contraband or weapons." *Id.*

Plaintiffs allege that in conducting these strip and visual body cavity searches, Defendants were acting pursuant to a policy, practice or custom of performing strip and visual body cavity searches on pre-detention hearing detainees without having a reasonable suspicion that such searches would produce contraband or weapons. *Id*. at 7. They further allege that Contra Costa County Chief Probation Officer Lionel Chatman and Contra Costa County Chief Deputy Probation Officer for Juvenile Hall Nancy Miller are "personally responsible for the promulgation and continuation of the strip search policy, practice and custom . . . ." *Id*. Both Chatman and Miller were sued in their individual and official capacities based on their alleged involvement in making and implementing the strip search policy at Contra Costa County's Juvenile Hall. *Id*. at 3.

---

[2] The First Amended Complaint includes factual allegations regarding named plaintiffs Russell Moyle and Katherine Ermitano. On June 28, 2007, however, Russell Moyle was dismissed from the action, pursuant to a stipulation by the parties. Accordingly, the Court recounts here only the factual allegations relating to Plaintiff Katherine Ermitano.

United States District Court

For the Northern District of California

1    However, in a stipulation filed November 21, 2007, the individual capacity claims against Chatman

2    and Miller were voluntarily dismissed.

3         Plaintiffs bring a purported class action asserting the following claims: 1) violation of Fourth

4    and Fourteenth Amendments and 42 U.S.C. § 1983; 2) violation of California's Bane Act, California

5    Civil Code section 52.1(a) and Unruh Civil Rights Act, California Civil Code section 52.1(b), based

6    on alleged use of coercion to deprive Plaintiffs of their rights under article I, section 1, of the

7    California Constitution and California Penal Code section 4030; 3) violation of California Penal

8    Code section 4030; and 4) exemplary damages.  Plaintiffs seek damages and injunctive relief, as

9    well as attorneys' fees and costs.

10        **B.    Evidence in the Record**

11             **1.    Intake and Search Practices at Contra Costa County's Juvenile Hall**

12        Since June 2005, Contra Costa County has been confining juvenile offenders at a new

13   Juvenile Hall that houses approximately 290 juvenile offenders.  Declaration of James V. Fitzgerald,

14   III in Support of Defendants' Motion for Summary Judgment ("Fitzgerald Summary Judgment

15   Decl."), Ex. B (Deposition of Nancy Miller ("Miller Depo.")) at 12.  Previously, an older facility

16   was used that housed somewhat fewer juveniles.  *See* Declaration of Mark E. Merin in Support of

17   Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Merin Summary Judgment

18   Decl."), Ex. F (Quarterly Juvenile Detention Survey with "Daily Snapshots" of Juvenile Hall

19   population on various dates between October 2003 and May 2005 ranging from 120 to 200

20   juveniles).

21        It is undisputed that between January 2000 and September 15, 2005, Contra Costa County

22   Juvenile Hall conducted strip searches of every juvenile offender who was admitted to Juvenile Hall.

23   Defendant Contra Costa County, Lionel Chatman, and Nancy Miller's Joint Statement of

24   Undisputed Facts and Defendants' Separate Statement of Proposed Undisputed Facts that Plaintiffs

25   Continue to Dispute in Support of Defendants' Motion for Summary Judgment ("Defendants'

26

27

28

1   Undisputed Facts"),[3] No. 6.  Similarly, juveniles were strip-searched after having contact outside

2   their unit during a visit with a person who worked outside the Juvenile Hall.  *Id*., No. 6.  The parties

3   do not dispute that on September 15, 2005, Contra Costa promulgated a written strip search policy

4   that replaced the practices that Plaintiffs allege are unlawful.[4]  *Id*., No. 11; *see also* Fitzgerald Decl.,

5   Ex. A (Policy).  Under the new policy, "[n]o pre-detention minor will be subjected to a strip search

6   or visual body cavity search unless reasonable suspicion exists that the minor is concealing

7   contraband that will be discovered in the search."  Fitzgerald Decl., Ex. A.  This policy expressly

8   applied to juveniles arrested for felonies as well as those who were arrested for misdemeanors and

9   infractions.  *Id*.

10      Between January 2000 and September 30, 2005, Contra Costa booked 14,700 juveniles, of

11   which, at least 3,832 were booked for "being in violation of offenses not involving violence, drugs

12   or weapons."  *Id*., No. 3; *see also* Fitzgerald Summary Judgment Decl., Ex. M (Defendants'

13   Response to Plaintiffs' Interrogatory No. 11).  Contra Costa contends that all but 81 of these

14   juveniles "were arrested in connection with or had a documented history of committing a serious

15   criminal offense, were subject to an unlimited search condition order from the Juvenile Court, had a

16   documented history of drug abuse, or posed a risk of harm to themselves or others."  Defendants'

17   Undisputed Facts, No. 4.  Plaintiffs assert that this number is inaccurate, however, because

18   "Defendants' list of charges they consider to be related to violence, drugs, and weapons includes

19   many charges *not* so related . . . ."  Plaintiffs' Response to Defendants' Statement of Disputed and

20   Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs'

21   Response to Defendants' Undisputed Facts"), No. 4.

22      During the relevant period, the decision to admit a juvenile to Juvenile Hall in connection

23   with a pre-arraignment offense was made by a Probation Department intake counselor.  *See*

24
25      [3] In Defendants' Statement of Undisputed Facts, Defendants include both facts that the parties agree are undisputed and facts that Defendants contend are undisputed.  The Court relies only on the former in this Order.

26
27      [4] Plaintiffs stipulated at oral argument that they are not challenging the policies and practices of Defendants regarding stip searches at Contra Costa Juvenile Hall after September 15, 2005, and conceded that they do not have evidence that the blanket strip policies that previously were followed continued after that date.

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Fitzgerald Summary Judgment Decl., Ex. E (Deposition of James White ("White Depo.")) at 9-12; Ex. F (Deposition of Joe Battle ("Battle Depo.")) at 31-34; Ex. G (Deposition of Michelle Schultz ("Schultze Depo.")) at 19-20; Ex. H (Deposition of Charles Gonsalves ("Gonsalves Depo.")) at 23-25.  In making the determination as to whether to admit a juvenile, intake counselors considered the type and seriousness of the offense the juvenile was charged with as well as whether the juvenile was already on probation.  *Id.*  According to Nancy Miller, Chief Deputy Probation Officer for Contra Costa Juvenile Hall, most of the juveniles admitted were charged with felonies rather than misdemeanors.  Fitzgerald Decl., Ex. B (Deposition of Nancy Miller ("Miller Depo.")) at 27.  As part of the admission process, the probation counselor generally reviewed and signed off on the juvenile's "booking sheet," completed by the arresting officer.  *See* Declaration of Mark E. Merin in Support of Plaintiffs' Motion for Class Certification ("Merin Class Certification Decl."), Ex. E (Deposition of Michelle Schulze ("Schulze Depo.")) at 22-23.  The probation counselor would also complete an Adjustment Record as part of the admission process.  *Id.* at 29.  This form included the name of the juvenile, the time and date of intake, the housing assignment, and any previous detention history.  *Id.* at 31-33 & Depo. Ex. 8.

### 2. Evidence Regarding Health and Safety

According to Juvenile Detention Survey Reports issued by the California Board of Corrections, juvenile offenders confined to county detention facilities in Contra Costa County attempted 89 suicides, 65 escapes and 59 assaults between 2000 and 2005.  Defendants' Summary Judgment Motion at 4 (citing Juvenile Detention Survey – Online Querying, available at www.bdcorr.ca.gov/joq/jds/QuerySelection.asp).  Contraband logs produced by Defendants that strip searches of juveniles at Juvenile Hall between 2000 and 2005 produced 94 items of contraband, including 45 weapons and 24 drug or drug-like substances.  *See* Fitzgerald Decl., Ex. L (contraband log).  The contraband logs do not specify where the items were hidden (i.e., in clothing or a body cavity); nor do they provide any information about the offenders from whom the items were seized (i.e., whether the juvenile was charged with a crime involving drugs, weapons, or violence).  *Id.*

United States District Court

For the Northern District of California

### 3.    Evidence Regarding Psychological Impact of Strip Searches

Plaintiffs provide three declarations addressing the harmful impact that strip searches can have on adolescents.  First, they have provided a declaration by John P. Rhoads, who held the position of Chief Probation Officer in Santa Cruz County from 1997 to 2002.  Declaration of John P. Rhoads in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Rhoads Decl."), ¶ 2.  Since 2002, Rhoads has worked as a consultant in the field of juvenile detention reform.  *Id.*, ¶¶ 2-6.  He states that he is opposed to blanket strip searches of juveniles because strip searches are "invasive, embarrassing and harmful to some children" and therefore, the decision to conduct strip searches should be made on an individualized basis, based on articulable facts that are reviewed by a supervisor.  *Id.*, ¶ 14.  Rhoads further states that in his opinion, "a careful pat down search made by a well-trained same sex staff along with utilization of metal detectors will intercept most if not all contraband and weapons that an institution will be concerned with."  *Id.*  Rhoads also cites to a 2007 report released by the National Center for Mental Health and Juvenile Justice that states that 49% of incarcerated girls suffer from post-traumatic stress disorder ("PTSD"), as compared to 20% of incarcerated boys."  *Id.*, ¶ 16.

Plaintiffs also provide a declaration by Dr. Lynn E. Ponton.  Declaration of Lynn E. Ponton, M.D., in Support of Plaintiff's Opposition to Defendants Motion for Summary Judgment ("Ponton Decl.").  Dr. Ponton is a medical doctor and a professor of psychiatry at the University of California San Francisco, specializing in adolescent psychiatry.  *Id.*, ¶¶ 1-2.  Dr. Ponton states that "[a]dolescents are much more conscious about their bodies and their sexual organs than adults . . . [which] contributes for a heightened need for personal privacy."  *Id.*, ¶ 7.  According to Dr. Ponton, strip searches violate this need for personal privacy.  *Id.*  Dr. Ponton further states that many adolescents have "undiagnosed trauma of emotional, physical and sexual natures" and that the rate of such trauma is higher in "juvenile settings" than in general.  *Id.*, ¶ 9.  As a result, such juveniles are "even more likely to be re-victimized by strip searches than other comparative groups of adolescents."  *Id.*

Finally, Plaintiffs provide a declaration by Russell Davis, who has held the position of Jail

6

United States District Court

For the Northern District of California

Administrator for the Santa Ana Police Department for the last 15 years.  Declaration of Russell

Davis in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Davis

Decl."), ¶ 2.  According to Davis, the Santa Ana Jail has housed juveniles for the last 9 or 10 years

under a contract with the Orange County Probation Department.  *Id.*  Russell expresses the opinion

that most of the contraband recovered by Defendants between 2000 and 2005 and referenced in their

Summary Judgment Motion would have been recovered through a pat-down search by a trained and

experienced intake officer.  *Id.* ¶ 11.  Davis further questions Defendants' assertion that their

"exemplary safety record" – according to Defendants, only 89 attempted suicides, 65 escapes, and

59 assaults on staff – was due to their use of strip searches, stating that "[a]ssuming that a blanket

strip search policy will prevent attempted suicides, escapes and assaults on staff is a stretch."  *Id.* ¶

12.  Rather, Davis states, a "good pat search policy and procedure will eliminate potential weapons

that could be used in an escape or assault."  *Id.*  With respect to suicide prevention, Davis states that:

> Utilizing strip searches as a suicide prevention tool would be
> counterproductive.  Inmates conceal drugs to support their habit, not to
> attempt suicide.  Suicide prevention screening, counseling, behavioral
> observations, and intervention are the most effective tools to prevent
> suicide attempts.

*Id.* ¶ 13.[5]

### 4.    Ermitano's Arrest and Subsequent Searches at Juvenile Hall

Katherine Ermitano was arrested by the Hercules Police on May 25, 2005, after her father

called the police to report that Ermitano was driving a black Ford Mustang that he did not recognize.

Declaration of Katherine Ermitano in Support of Plaintiffs' Motion for Class Certification

("Ermitano Class Certification Decl.") at 1-2.  Ermitano was first taken to the Hercules Police

Department for interrogation, and then to Contra Costa Juvenile Hall, at around 1:00 a.m. on May

26.  *Id.* at 2.  An Intake Probation form (the "booking sheet") filled out by one of the Hercules

Department Officers involved in the arrest, Officer Russell, contains the following account:

---

[5]  Both Davis and Russell also express opinions about the legality of Defendants' strip search practices prior to the 2005 change in policy.  These legal conclusion are not binding in any way on the Court and the Court does not consider them.  Consequently, the Court also need not address Defendants' objections that these experts are not qualified to testify because they are not familiar with various legal doctrines, such as the doctrine of *in loco parentis*.  *See* Defendants' Summary Judgment Reply at 9.

1

**United States District Court**
For the Northern District of California

> On 5-25-05 at about 2152 hours Katherine's father, Marlon, called the police because Katherine was driving a 2005 black Ford Mustang and he did not know who it belonged to. Marlon stated Katherine told him she was watching it for a friend.
>
> Officer Biasas responded to 175 Grenadine to make contact with Marlon and Katherine. He also conducted a records check on the VIN of the vehicle (2005 black Ford Mustang). The vehicle was reported stolen out of San Ramon on 5-11-05 and the keys to the vehicle were taken out of the driver's home during a residential burglary.
>
> I responded to 175 Grenadine and Marlon said he took the keys from Katherine and handed them to Officer Biasas. I arrested Katherine and transported her to HPD where I read her rights per Miranda. Katherine said she would answer my questions and admitted to stealing the Mustang. Katherine stated the keys to the Mustang were sitting on the front left tire of the vehicle however she denied burglarizing the victim's home.

Fizgerald Decl., Ex. K (Ermitano Depo.), Depo. Ex. 3 (KE 0119).

Hercules Police Officers Biasas and Russell both completed reports relating to Ermitano's arrest. *See id.* at KE 0123-0125 (Russell Report); Declaration of Carla Meninsky in Support of Defendants' Reply in Support of its Motion for Summary Judgment ("Meninsky Reply Decl."), Ex. G (Biasas Report). There is no evidence in the record, however, that these reports were provided to the intake officers at Juvenile Hall when Ermitano was admitted. The reports contain additional details that were not included in the Intake Probation form – including information about how Ermitano learned about the victim via an Internet chat room for Mustang owners – but do not differ significantly from the account provided by Officer Russell in the Intake Probation form discussed above.

According to Ermitano, after arriving at Juvenile Hall, she was left alone in a room, where she slept until around 7:00 a.m. Ermitano Decl. at 2. At that point, she was taken out of the room, photographed, and asked to provide general information about herself (e.g., name and birth date). *Id.* After that, she was taken to a shower room and strip-searched. *Id.* Subsequently, Ermitano was placed in a room with a solid door and a window looking out into the adjacent neighborhood. *Id.* Ermitano was interviewed by a probation counselor on the afternoon of May 26 and on May 27. *Id.* at 2-3. According to Ermitano, she was strip-searched before and after both meetings. *Id.* Ermitano

8

United States District Court

For the Northern District of California

1   further testifies that she was strip-searched before and after a visit with her parents on May 27 and

2   before her court appearance on May 31.  *Id.*  Ermitano was released after that hearing.  *Id.*

3       During her meeting with the probation counselor – apparently the meeting on May 27 –

4   Ermitano told the counselor that she had suffered from depression and had attempted suicide several

5   months before.  *See* Fitzgerald Decl., Ex. K (Ermitano Depo.) at 128-30 (stating that during meeting

6   that occurred "the next day," that is, "24 hours after [she] had been admitted to the hall," Ermitano

7   told counselor she suffered from depression and had attempted suicide); *see also* Depo. Ex. 2

8   ("Intake Complaint Record" noting previous suicide attempt, that Ermitano had taken Prozac for two

9   months and that she was seeing a psychiatrist).

10      In addition to the meetings described by Ermitano, Hercules Police Officer B. Persson also

11  stated in a report dated May 31, 2005, that he interviewed Ermitano at Juvenile Hall on May 27.  *See*

12  Fitzgerald Decl., Ex. K (Ermitano Depo.), Depo. Ex. 4 (KE0108 - 111).  According to Persson,

13  Ermitano admitted that she had stolen the car and also that she had broken into the owners' house to

14  steal the keys to the car.  *Id.*  According to the report, she told the officer that she broke into the

15  house after ringing the bell and getting no answer.  *Id.*  She also told him that in trying to enter the

16  master bedroom to search for the keys to the car, she used a large knife she found in the kitchen to

17  cut a window screen.  *Id.*

18      **C.      The Summary Judgment Motion**

19      Defendants seek summary judgment on the following grounds: 1) Plaintiffs' constitutional

20  claims fail as a matter of law because the strip search policy at issue was constitutional under *Earl v.*

21  *Board of Education*, 536 U.S. 822 (2002) and its progeny; 2) the request for injunctive relief is either

22  moot or barred under *Younger v. Harris*, 401 U.S. 37 (1970) because the County changed its practice

23  regarding strip searches at juvenile hall when it adopted to the new policy on September 15, 2005; 3)

24  the County of Contra Costa is immune from liability on the state law claims California Government

25  Code section 844.6, which immunizes public entities from liability arising out of state law claims

26  asserted by persons confined to its custody, including juveniles; 4) the searches were lawful based

27

28

on the specific facts of Ermitano's arrest and confinement because she was searched in connection

with an offense involving violence, weapons, or drugs and had a history of suicide.[6]

### D.   The Class Certification Motion

Plaintiffs seek class certification under Rule 23(b) of the Federal Rules of Civil Procedure on

the basis that there is a core legal and factual issue common to the defined class, that is, "whether the

Contra Costa County Juvenile Hall's blanket strip search policy was constitutional under the State

and Federal Constitution."  Class Certification Motion at 2.  Plaintiffs seek certification as to two

classes, defined as follows:

> Class One: All juveniles admitted and housed at Contra Costa County Juvenile Hall during
>
> the class period who were strip-searched at intake pursuant to defendants' blanket policy and
>
> practice of strip searching all such juveniles prior to their detention hearings, except for those
>
> who were strip-searched at intake after being admitted for an alleged violation (felony or
>
> misdemeanor) involving violence, drugs or weapons, or those who were strip-searched at
>
> intake because of a reasonable suspicion that such strip search would be productive of
>
> contraband.
>
> Class Two: All juvenile arrestees in Class One who were strip-searched before and/or after
>
> visits or court appearances, prior to the detention hearing, during the class period.

Class Certification Motion at 5.  The class period for both classes is defined as "all persons who are

currently juveniles or who reached the age of majority [i.e., 18 years of age] within two years of

filing this action [i.e., June 8, 2003]."  *Id*.

---

[6]  Defendants also asserted in the Summary Judgment Motion that individual defendants Chatman and Miller were entitled to qualified immunity under federal law because their actions were not objectively unreasonable under the circumstances and because there was no evidence that these individuals had any personal involvement in the allegedly illegal strip searches. This issue has become moot, however, because Plaintiffs have dismissed Chatman and Miller, in their individual capacities, from the case.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

III.     **ANALYSIS**

    A.     **Defendants' Summary Judgment Motion**

        1.     **Legal Standard on Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

        2.     **Fourth Amendment Claims**

Defendants assert that Plaintiffs' Fourth Amendment claims (brought under 42 U.S.C. § 1983) fail, as a matter of law, because the "special need" to protect minors in the custody of Juvenile Hall justifies the policy of conducting strip searches – both upon admission and after juveniles have had contact with individuals outside Juvenile Hall – without reasonable suspicion that contraband will be found. Alternatively, Defendants assert that they are entitled to summary judgment because "[t]he particular circumstances surrounding Ermitano's arrest and confinement justified the searches." Summary Judgment Motion at 22. The Court is not persuaded by either argument.

United States District Court

For the Northern District of California

1    The second argument has no merit.  In their Summary Judgment Motion, Defendants assert

2    in a cursory fashion that the strip searches of Ermitano were justified because "she was searched in

3    connection with an offense involving violence, weapons, or drugs and had histories [sic] suicide."

4    *Id*.  In particular, they cite facts that Ermitano revealed to a Hercules Police Officer and a probation

5    counselor at least a day after she was admitted to Juvenile Hall, namely, that she had used a kitchen

6    knife to cut a door screen in committing the offense for which she was arrested and she had

7    attempted suicide several months before.  Therefore, Defendants argue, there was reasonable

8    suspicion to justify the searches of Ermitano.

9    Where the arresting officer had a reasonable suspicion that an arrestee possessed a weapon or

10   contraband, a strip search does not violate the Fourth Amendment.  *Giles v. Ackerman*, 746 F.2d 614

11   (9th Cir. 1984).  Reasonable suspicion, however, depends on the facts known at the time of the strip

12   search by the individuals who made the decision to strip-search Ermitano.  *See United States v.*

13   *Erwin*, 803 F.2d 1505, 1510 n.2 (9th Cir. 1986) (evidence obtained after seizure occurred could not

14   be considered in determining whether seizure was justified by reasonable suspicion).  Here, it is

15   undisputed that Ermitano's suicide attempt and her use of a kitchen knife to carry out the burglery

16   were unknown at the time of intake.  Thus, these facts do not support the conclusion that there was

17   reasonable suspicion to justify the search that was conducted upon Ermitano's admission.  Nor is

18   there any evidence in the record that this information was ever communicated to any individual who

19   was involved in the subsequent strip searches.  Therefore, Defendants' argument fails as to these

20   additional strip searches.

21   The more difficult question facing the Court is whether Defendants' practice of conducting

22   blanket strip searches of juveniles at Juvenile Hall, either at intake or after outside contact, was

23   justified under the circumstances because of the risks and dangers that inhere in the juvenile

24   detention setting and the state's obligation to act *in loco parentis* to protect children in its custody.

25   The starting point for this analysis is the approach articulated in *Bell v. Wolfish*, that is, "[t]he test of

26   reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular

27   search against the invasion of personal rights that the search entails."  441 U.S. 520, 559 (1979).

28

United States District Court

For the Northern District of California

In the Ninth Circuit, it is well-established that a policy of strip-searching adults arrested for minor offenses without reasonable suspicion of finding weapons or contraband violates the Fourth Amendment because the need to conduct such searches has not been found to be sufficient to justify such a serious intrusion on an individual's privacy. *See Ward v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir. 1985) (holding that in 1981, "the law was sufficiently clear . . . so as to expose a public official who unreasonably authorized blanket strip searches of minor offense arrestees to civil liability under 42 U.S.C. § 1983"). It is less clear, however, whether this rule applies in the context of juveniles held in pre-detention hearing custody. As the Supreme Court has cautioned, "children have a very special place in life which law should reflect." *Eddings v. Oklahoma*, 455 U.S. 104, 116 n.12 (1982) (quoting *May v. Anderson*, 345 U.S. 528, 536 (1953)). Further, there may be situations in which "special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirements impracticable." *Earls v. Bd. of Educ.*, 536 U.S. 822, 829 (2002). In *Earls*, the Court explained that in conducting the balance between the intrusiveness of the search and legitimate government interests, courts must keep in mind that there are "certain limited circumstances" involving "safety and administrative regulations" in which the Government's need to "discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting searches without any measure of individualized suspicion." *Id.* (citations omitted).[7]

In the absence of any definitive Ninth Circuit authority addressing the constitutionality of suspicionless strip searches of juveniles in pre-detention hearing custody, the Court looks for guidance to three cases that address similar issues: *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004),

---

[7] Defendants assert that Plaintiffs' Fourth Amendment claims are based on a "fundamental misunderstanding" of the juvenile law governing strip searching practices, suggesting that the "special needs" test is qualitatively different from the approach used to analyze the constitutionality of adult strip searches in *Bell v. Wolfish* and its progeny. *See* Defendants' Summary Judgment Reply at 2. Defendants are incorrect. As the court in *N.G. v. Connecticut* noted, "the 'special needs' standard does not validate searches simply because a special need exists. Instead, what is required is a 'fact-specific balancing of the intrusion . . . against the promotion of legitimate governmental interests.' [*Earls*, 536 U.S. at 830.] This is simply an application of the overarching principle that '[t]he test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.' *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)." 382 F.3d 225, 231 (2d Cir. 2004).

1    *Smook v. Minnehaha County*, 457 F.3d 806 (8th Cir. 2006), and *Flores v. Meese*, 681 F. Supp. 665

2    (C.D. Cal. 1988).

3          In *N.G.*, the court addressed the constitutionality of the blanket policy of strip-searching all

4    juveniles admitted to juvenile detention centers upon intake and upon return to the centers after

5    leaving, for example, for court appearances.  382 F.3d at 227.  The action was brought on behalf of

6    two girls, S.C. and T.W.  *Id*. at 228-29.  S.C. had a history of "mental illness, suicide attempts, self-

7    mutilation, sexual activity with older men, drug and alcohol abuse, and drug peddling."  *Id*. at 228.

8    T.W. had a "history of persistent truancy, and possible mental health issues."  *Id*. at 229.  Both

9    children had been adjudicated to be members of a "family with service needs" under Connecticut

10   law, allowing for detention upon a finding by a judge that a "delinquent act" has been committed.

11   *Id*. at 227.

12         Eight strip searches of S.C. were at issue, the circumstances of which varied.  First, after

13   being arrested for running away in violation of a court order, S.C. was delivered to a juvenile

14   detention center, where she was strip-searched upon admission.  *Id*. at 229.  She was then transferred

15   to another juvenile detention facility, where she was strip-searched a second time.  *Id*.  After

16   returning from a court appearance, to which she was transported in handcuffs and shackles, S.C. was

17   strip-searched a third time.  *Id*.  She was later released to her parents but ran away from home again,

18   at which point she was again admitted to a juvenile detention center and strip-searched a fourth time.

19   *Id*.  Following another court appearance, at which she was ordered detained at a different facility,

20   S.C. was strip-searched a fifth time.  *Id*.  Once again, S.C. was transported to court in handcuffs and

21   shackles.  *Id*.  The sixth and seventh strip searches were conducted in connection with pencils that

22   disappeared from S.C.'s unit in the juvenile detention center.  *Id*.  The eighth strip search occurred

23   after S.C., who had now been released from juvenile detention, ran away once again, and then turned

24   herself in to the police, who took her to a juvenile detention center.  *Id*.

25         T.W. was strip-searched twice.  *Id*.  First, she was strip-searched upon admission to a

26   juvenile detention center after she was detained for violating a court order to attend seventh grade.

27   *Id*.  She was strip-searched a second time when she was transferred to another facility.  *Id*.

28

14

**United States District Court**

For the Northern District of California

The court in *N.G.* sought to balance the intrusion on the juveniles' privacy against the states' interest in conducting the strip searches to determine whether the searches were reasonable. *Id.* at 232. The court began by noting that "[s]trip searches of children pose the reasonableness inquiry in a context where both the interests supporting and opposing such searches appear to be greater than with searches of adults confined for minor offenses." *Id.* On one hand, the court explained, the state's obligation to "act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm." *Id.* On the other hand, "the adverse psychological effect of a strip search is likely to be more severe upon a child than an adult, especially a child who has been the victim of sexual abuse." *Id.* The court then looked to the specific circumstances of the strip searches. *Id.* at 233.

First, the court addressed the constitutionality of S.C's second, third and fifth searches, and T.W.'s second search, all of which were conducted following transfer from one facility to another. *Id.* Noting that there was no evidence that the girls had an opportunity to obtain contraband during the transfers, the court concluded that there was "no state interest sufficient to warrant repeated strip searches simply because of transfer to other facilities." *Id.* On this basis, the court concluded that the strip searches following transfer were unconstitutional. *Id.*

Second, the court addressed the strip searches of S.C. while she was in juvenile detention occasioned by the disappearance of pencils on two separate occasions (the sixth and seventh strip searches). *Id.* at 234. These strip searches occurred after numbered pencils were handed out to a group of girls in a room and one was not returned. *Id.* The court held that the possibility that a pencil could be used as a weapon and could be concealed in a body cavity was to unlikely to justify strip searches of all girls, in the absence of reasonable suspicion that a particular girl actually had concealed the pencil. *Id.* Thus, these strip searches as well were found to be unconstitutional.

Finally, the court addressed the strip searches that were conducted upon intake. *Id.* at 235. The court found that this raised a closer issue than the other strip searches and that the facts of the case did not "yield an obvious answer to the question whether it was constitutionally 'reasonable' to perform strip searches upon their initial admission to detention facilities." *Id.* at 237. Nonetheless, the court concluded that weighing the special obligations to protect the children in detention against

United States District Court

For the Northern District of California

the risks to the psychological health of the children associated with performing strip searches upon initial admission, the strip searches were constitutional. *Id.* In reaching this conclusion, the court focused in particular on three factors that it found supported the constitutionality of such searches. First, the court pointed to the state's "pervasive responsibility for children in detention centers twenty-four hours a day." *Id.* Second, it pointed to the protective function of strip searches for locating items that could be used for self-mutilation or suicide, noting that over half of girls admitted to juvenile detention centers show signs of self-mutilation. *Id.* Third, the court pointed to evidence that strip searches often reveal evidence of abuse that occurred at home. *Id.* With respect to this third factor, the court acknowledged that this was not articulated as one of the reasons for conducting strip searches by the officials involved, but concluded that it could be considered as one of the "special needs" that confronts the state when it admits children to juvenile detention centers. *Id.*[8]

In *Smook*, the court reached a similar result on somewhat different facts. There, the plaintiff challenged the blanket strip search policy of a juvenile detention center, but it was undisputed that the juvenile had not been asked to remove her undergarments. 457 F.3d at 809. Because she was not subjected to a full strip search, the court concluded, Smook's constitutional claim was "not as strong as that of the juveniles in *N.G.*" *Id.* at 811. In particular, because the intrusion was less severe, the case did not present the "close constitutional question" presented in *N.G. Id.* at 812. Rather, the court found that the balance clearly tipped in favor of the defendants because of the state's "legitimate responsibility to act *in loco parentis* with respect to juveniles in lawful state custody." *Id.*

---

[8] Based on the court of appeals' account of the district court ruling, the district court approached the Fourth Amendment question somewhat differently, stating on the record that although the policy of strip searching all children in juvenile detention centers violated the Fourth Amendment, the strip searches of S.C. and T.W. were reasonable because the history of both girls "suggest[ed] prospective behavior which would predispose them to bringing various contraband into a [Juvenile Detention Center]." *Id.* at 230 (quoting district court ruling). The court of appeals, in contrast, did not rely on the girls' history in reaching the conclusion that the intake searches (or any other searches) were constitutional. The court of appeals further noted that to the extent the district court made a statement about the facial validity of the strip search policy, the court declined to review that question because the court's judgment contained no declaration to that effect.

**United States District Court**
For the Northern District of California

1    In contrast to *N.G.* and *Smook*, a district court in *Flores v. Meese* held that a policy of strip-

2    searching all juveniles admitted to an INS detention facility was unconstitutional.  681 F. Supp. 665,

3    669 (C.D. Cal. 1988).  Starting with the balancing test articulated in *Bell v. Wolfish*, and taking into

4    account that children are "especially susceptible to possible traumas from strip searches," the court

5    held that the policy was unreasonable under the Fourth Amendment.  *Id*. at 667.  First, it rejected the

6    government's assertion that strip searches were necessary to maintain security, noting that there was

7    "no evidence" that any contraband had been discovered at two of the facilities at issue and minimal

8    evidence that contraband had been found as a result of juvenile strip searches at a third facility.  *Id*.

9    The court further noted that the facilities at issue had not experienced the sort of serious security

10   problems that had been at issue in *Bell v. Wolfish*.  *Id*.  Finally, the court noted that the children

11   detained in INS facilities are not "charged with any criminal offense, let alone an offense that might

12   indicate a propensity to conceal weapons or contraband on their persons."  *Id*. at 668.

13        With the above discussion in mind, the Court turns to the task of balancing the severity of the

14   intrusion that results from the challenged practices against Defendants' legitimate need to protect the

15   children in its custody at Juvenile Hall.  With respect to the former, the Court finds that the severity

16   of the intrusion is extremely significant.  Here, as in *N.G.* and *Flores* (and in contrast to *Smook*), the

17   policy at issue involves a full strip search of juveniles, whether or not there is reasonable suspicion

18   to suspect contraband.  Courts have repeatedly recognized that such strip searches may be

19   particularly traumatic to juveniles and especially to juveniles who are detained in juvenile detention

20   centers, who are more likely than juveniles in the general population to suffer from PTSD or other

21   trauma.  *See, e.g., N.G.,* 382 F.3d at 232 & n.10; *Justice v. City of Peachtree*, 961 F.2d 188, 193

22   (11th Cir. 1992) ("[i]t is axiomatic that a strip search represents a serious intrusion upon personal

23   rights"); *see also* Rhoads Decl., ¶ 16; Ponton Decl., ¶ 9.

24        Against this intrusion, the Court weighs the evidence presented by Defendants in support of

25   such a policy.  The Court concludes that the evidence is insufficient to establish, as a matter of law,

26   that the challenged policy is constitutional.  Defendants rely heavily on evidence that juveniles

27   admitted to Juvenile Hall are generally charged with serious crimes, in contrast to the juveniles

28   detained in *Flores*, who were not accused of any crime.  They also point to evidence that contraband

United States District Court

For the Northern District of California

1   has been recovered from strip searches, which includes both weapons and drugs, in support of their

2   claim that strip searches are necessary to protect the safety of the juveniles in their custody.

3       While the Court agrees that the circumstances in *Flores* did not present the sort of difficult

4   security issues faced by Contra Costa Juvenile Hall, it concludes, nonetheless, that Defendants'

5   evidence falls short of establishing the constitutionality of blanket strip searches – both upon intake

6   and after returning from visits with individuals who were not employed by Juvenile Hall.  With

7   respect to the strip searches that were conducted upon admission to Juvenile Hall, there has been no

8   showing that the contraband listed in the contraband log was seized from juveniles like Ermitano,

9   whose crime did not involve violence, drugs, or weapons.[9]  Further, in the face of Plaintiffs'

10   evidence that this contraband could have been detected through the use of pat searches and a metal

11   detector, Defendants have offered no evidence showing that the more intrusive strip search was

12   required.  Nor have they pointed to evidence that *any* of the contraband listed on the logs was

13   concealed in a body cavity.  Similarly, with respect to the strip searches conducted after visits with

14   probation counselors and parents, there has been no showing that strip searches are necessary to

15   protect the children at Juvenile Hall.  Indeed, the possibility that contraband or weapons might be

16   given to juveniles by probation counselors seems particularly unlikely.

17       The Court also notes that in *N.G.*, the court relied upon evidence that strip searches

18   sometimes revealed abuse at home, thus allowing juvenile authorities to address this problem.  In

19   that case, this evidence was considered to add to the combination of special needs confronting the

20   state.  Here, however, Defendants have presented no evidence that strip searches have ever revealed

21   cases of abuse.

22       Considering all of these factors, the Court concludes that Defendants have fallen short of

23   demonstrating that their blanket search policy, both upon admission and after visits with non-

24

25

26       [9] As discussed further below, the Court rejects Defendants' assertion that the burglary Ermitano later admitted to was a crime  of violence.  The Court finds that a crime of violence, at a minimum, requires some threat of physical harm to *another individual*.  Use of a kitchen knife that Ermitano found in an empty house to cut a screen does not make Ermitano's offense a crime of violence.  Similarly, the kitchen knife itself does not constitute a weapon as Ermitano did not bring it to the scene and used it only as a tool.

**United States District Court**
For the Northern District of California

1    Juvenile Hall individuals, was constitutional.  Accordingly, summary judgment is denied as

2    Plaintiffs' Fourth Amendment claims.

3                            **3.        Availability of Injunctive Relief**

4            Defendants assert that injunctive relief is not available to Plaintiffs for three reasons: 1) the

5    practice challenged by Plaintiffs was replaced by a new policy and, therefore, there is no reasonable

6    likelihood that Plaintiff's will be subjected to the same conduct in the future; 2) the named Plaintiff

7    is no longer a juvenile, having reached the age of 18, and, therefore, would not be subject to

8    confinement as a juvenile; and 3) the court should abstain under *Younger  v. Harris*, 401 U.S. 37

9    (1970) from exercising jurisdiction over injunctive relief claims that may be the subject of a juvenile

10   court proceeding.  The Court rejects all three arguments.

11                           **a.        Standing and Mootness**

12           Defendants' first two arguments are based on the doctrines of standing and mootness.  In

13   order to establish standing under Article III of the Constitution, a plaintiff must demonstrate the

14   existence of an actual "case or controversy" for each form of relief sought.  *See Friends of the Earth,*

15   *Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 185 (2000).  Where injunctive relief is sought, a

16   plaintiff's allegations must show that, at the time the litigation was initiated, the plaintiff faced a

17   "real and immediate" threat of injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *see*

18   *also Friends of the Earth*, 528 U.S. at 704 (holding that Article III inquiry addresses whether there

19   was standing at the "outset of the litigation").  In *Lyons*, the Court addressed whether a plaintiff had

20   standing under Article III of the Constitution to seek injunctive relief where the plaintiff alleged that

21   he had been subjected to excessive force when police officers used a choke hold on him during a

22   traffic stop.  *Id*. at 97-98.  The Court held that he did not, finding that although it was *possible* the

23   plaintiff might be stopped again and subjected to a choke hold, it was not sufficiently likely to give

24   rise to "a real immediate threat" that he would be subjected to such conduct, as would be required to

25   support a finding of standing with respect to the plaintiff's claim for equitable relief.  *Id*. at 105.  The

26   Court noted, however, that the plaintiff *would* have had standing on his equitable relief claim if he

27   had alleged that the police always used choke holds during traffic stops, or that the City ordered or

28   authorized police officers to engage in such conduct.  *Id*. at 105-06.  *See also Armstrong v. Davis*,

United States District Court

For the Northern District of California

275 F.3d 849, 861 (9th Cir. 2001) (holding that a plaintiff in a putative class action has standing to seek injunctive relief where the harm is the result of a written policy or a pattern of officially sanctioned behavior).

Where a defendant changes its policy or practice *after* the litigation is initiated, that voluntary cessation generally does not deprive a plaintiff of standing to seek injunctive relief. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (holding that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, ie., does not make the case moot"). The Court in *W.T. Grant* explains that because a defendant is "free to return to his old ways," a "controversy remains to be settled in such circumstances." *Id.* at 632. Accordingly, where the defendant voluntarily ceases to engage in the challenged conduct, the case becomes moot only if the defendant meets the "heavy burden" of demonstrating that "there is no reasonable expectation that the wrong will be repeated." *Id.* (citations omitted); *see also Friends of the Earth*, 528 U.S. at 189-90. As the Court noted in *Friends of the Earth*, the heavy burden that must be carried in order to establish mootness on the basis of a defendant's voluntary cessation of conduct gives rise to the result that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190.

To determine whether a defendant has established mootness based on voluntary cessation of conduct, courts consider whether the change in conduct is accompanied by circumstances indicating the change is a "genuine" act of "self-correction." *See Magnuson v. City of Hickory Hills*, 933 F. 2d 562, 565 (7th Cir. 1991). Where the defendant has ceased to engage in the challenged conduct only for practical or strategic reasons– such as avoiding litigation – the cessation does not make the case moot. *See United States v. Government of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004) (holding that where Government of Virgin Islands withdrew from challenged contract just before litigation was initiated and governor offered only general reason that withdrawal was in the "best interest" of the Virgin Islands, voluntary cessation was likely only a strategic move to avoid litigation and therefore case was not moot). Further, where a defendant has not conceded that its past conduct is illegal, courts are less likely to find a cessation of challenged conduct makes the case moot. *See*

1  *Armster v. United States Dist. Court for the Cent. Dist. of Cal.,* 806 F.2d 1347, 1359 (9th Cir. 1986);

2  *Sasnett v. Litscher*, 197 F.3d 290, 291-292 (7th Cir. 1999).

3       Applying the doctrines set forth above, at least two courts have held that plaintiffs who

4  brought challenges to blanket strip search policies had standing to seek injunctive relief based on

5  those challenges, even though the policies were changed after litigation commenced.  *See Maneely v.*

6  *City of Newburgh*, 208 F.R.D. 69, 72-73 (S.D.N.Y. 2002) (holding that consistent with *Lyons*,

7  plaintiff had standing with respect to claim for injunctive relief based on allegedly unconstitutional

8  strip search where the plaintiff was strip-searched pursuant to an official policy of strip-searching all

9  arrestees); *Mack v. Suffolk County*, 191 F.R.D. 16, 20 (D. Mass. 2000) (same).  In both cases, the

10  courts found that *Lyons* was distinguishable because in *Lyons*, the challenged practice did not

11  involve a policy that was applied to all detainees.  The courts in both cases further found that the

12  defendants had not established that there was no "reasonable expectation" that the challenged

13  conduct would resume, pointing out that the defendants had changed their conduct only in response

14  to litigation, even though the law governing the strip search policies at issue in those cases had been

15  established for many years.

16       The Court finds the reasoning in *Maneely* and *Mack* to be persuasive.  Here, as in those

17  cases, Plaintiffs challenge an established practice under which *all* juveniles were strip-searched

18  when they were admitted to Contra Costa Juvenile Hall.  This policy  was still in effect when the

19  litigation commenced.  Therefore, at the time this action was initiated, Ermitano and the class of

20  plaintiffs she purports to represent, in contrast to the plaintiff in *Lyons*, faced a real and immediate

21  threat of being subjected to a strip search again.  Thus, the standing requirement under Article III has

22  been satisfied.  Further, Defendants' change in policy – which Chatman testified was in response to

23  this litigation – does not render Plaintiffs' claims moot.  Although it is true that the law in this case

24  is less clear-cut than it was in *Maneely* and *Mack* (both of which involved strip search policies in the

25  adult context), Defendants' change in policy was in response to this litigation and has been

26  accompanied by continued assertions in this litigation that it's prior practices were constitutional.

27  Therefore, the Court concludes that Defendants have not met the "heavy burden" required to

28  establish mootness.

United States District Court

For the Northern District of California

1   The Court does not find that *Smook* requires a contrary result.  In *Smook*, the court held that

2   the plaintiffs did not have standing to bring an injunctive relief claim challenging a blanket strip

3   search policy that was applied to all juveniles admitted to a juvenile detention center because the

4   defendants' policy changed within a month after the strip search on which the complaint was based.

5   457 F.3d at 816.  The court concluded that the plaintiffs did not establish that there was a real and

6   immediate threat that they would be strip-searched again under this new policy, citing to *Lyons*.  457

7   F.3d at 816.  The Court does not adopt the holding of *Smook* for two reasons.  First, although it is

8   unclear whether the policy at issue in *Smook* changed before or after litigation commenced, the fact

9   that the court in that case addressed standing only, and did not mention or cite to case law involving

10  mootness, indicates that the policy changed *before* the litigation commenced.  As the Supreme Court

11  explained in *Friends of the Earth*,  there may be circumstances in which the likelihood that conduct

12  will be resumed is too speculative to establish standing at the outset of a case but sufficient to

13  overcome mootness.  528 U.S. at 190.  *Smook* may be an example of that principle.

14  Second, to the extent the policy in *Smook* may have been changed after litigation

15  commenced, the Court declines to follow that decision because the court failed to address what this

16  Court, like the courts in *Maneely* and *Mack*, finds to be a critical distinction between the facts here

17  and those in *Lyons*: that the allegations here relate to an established policy of subjecting *all* of the

18  members of the purported class to strip searches, taking the claims out of the realm of the

19  speculative.  The *Smook* court also failed to address the established case law  relating to voluntary

20  cessation of challenged conduct (again, assuming the policy at issue was changed after litigation

21  commenced), which places the burden squarely on the *defendant* to show that the challenged

22  conduct will not recur.  Therefore, the Court declines to adopt the approach or holding of *Smook*

23  with respect to the availability of injunctive relief.

24  Finally, the Court rejects Defendants' assertion that the action is moot because Plaintiff is no

25  longer a juvenile.  While it is true that this development would moot Ermitano's injunctive relief

26  claim if it were asserted only on her own behalf, because Plaintiff represents a putative class that

27  may still be detained at Contra Costa Juvenile Hall and therefore subjected to the challenged

28  conduct, this case falls within "that narrow class of cases in which the termination of a class

22

United States District Court

For the Northern District of California

1   representative's claim does not moot the claims of the unnamed members of the class" because the

2   claim is "capable of repetition but evading review."  *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11

3   (1975).  Therefore, the fact that Plaintiff is no longer a juvenile also does not render Plaintiffs'

4   request for injunctive relief moot.

5                    **b.      *Younger* Abstention**

6          Defendants assert that the Court should dismiss Plaintiffs' claims under *Younger v. Harris* on

7   the basis that federal courts must not interfere with state criminal prosecutions unless there is a

8   threat of "great and immediate injury."  401 U.S. at 36.  Defendants have not pointed to any

9   particular state criminal prosecution with which Plaintiffs' injunctive relief claim would interfere.

10  Therefore, the Court rejects this argument.

11         For the reasons stated above, the Court concludes that Defendants are not entitled to

12  summary judgment on Plaintiffs' claim for injunctive relief.

13              **4.      Immunity of the County of Contra Costa Under State Law**

14         Defendants argue that the County is entitled to immunity on Plaintiffs' state law claims under

15  California Government Code section 844.6.  The Court agrees.

16         Section 844.6 provides that public entities shall not be liable for "an injury to any prisoner"

17  except as provided in California Penal Code sections 814, 814.2, 845.4 and 845.6 and in Title 2.1

18  (commencing with section 3500) of Part 3 of the Penal Code.  Although Plaintiffs do not contend

19  that any of the exceptions that are specifically enumerated in section 844.6 apply here, they assert

20  that this provision nonetheless does not bar their state law claims against the County of Contra

21  Costa.  According to Plaintiffs, the immunity provided in section 844.6 was not intended to strip

22  prisoners of the protection of statutes that were specifically enacted for their benefit, such as

23  California Penal Code section 4030.  Nor, Plaintiffs assert, does this provision deprive prisoners of

24  their right to sue public entities for rights guaranteed under the California constitution.  In support of

25  their position, Plaintiffs cite the introductory language of section 844.6, namely, the exclusion of the

26  specific provisions listed above.  Plaintiffs also cite *Hart v. County of Orange*, 254 Cal. App. 2d 302

27  (1967).  In that case, the court held that an earlier version of section 844.6 that did not contain the

28

**United States District Court**
For the Northern District of California

1   any specific exceptions did not preclude liability under California Penal Code section 845.6, which

2   creates liability on the part of public entities based on failure to obtain medical care for a prisoner.

3           The Court is not persuaded by Plaintiffs' arguments.  As another district court has held in

4   addressing the same issue, the principle of *expressio unius est exclusio alterius* supports the

5   conclusion that if the legislature had intended to exclude Penal Code section 4030, California Civil

6   Code section 52.1, or particular sections of the California Constitution, from the purview of section

7   844.6, it would have listed these provisions and sections along with the other exceptions.  *See*

8   *Kozlowski v. Sacramento County*, Case No. C-04-0238 (E.D. Cal. March 11, 2005) (dismissing

9   claims against County defendant under California Penal Code section 4030 and California Civil

10  Code section 52.1 on the basis of the immunity afforded public entities under section 844.6); *see*

11  *also Russello v. United States*, 464 U.S. 16, 23 (1983) (explaining that where the legislature includes

12  particular language in one section of a statute but omits it in another section, it is generally presumed

13  that the legislature acts intentionally and purposely in the disparate inclusion and exclusion).

14          Nor does *Hart* support a contrary result.  In that case, the court addressed a previous version

15  of the statute that did not contain any specific exclusions.  254 Cal. App. 2d at 306.  The court

16  concluded that the legislature did not intend to do away with public entity liability under statutory

17  provisions like section 845.6 that affirmatively create liability.  *Id.*  The legislature apparently agreed

18  as to the specific provision at issue in *Hart*, amending section 844.6 three years later to clarify that it

19  did not extend to that provision or three other enumerated provision.  *See* Legislative Committee

20  Comments to 1970 Amendment.  Notably, however, the legislature did not amend section 844.6 to

21  broadly exclude any provision creating liability on the part of prisoners, as would have been

22  consistent with the reasoning of *Hart*.  Rather, it identified specific provisions that were excluded.  It

23  amended the provision again in 1977 to add another specific exclusion.  In light of the legislature's

24  choice to take this narrow approach, it is reasonable to conclude that claims under Penal Code

25  section 4030 and Civil Code section 52.1 were *not* intended to be excluded under section 844.6,

26  even though both of those provisions were enacted after section 844.6.  Indeed, the legislature has

27  shown, in enacting the amendments of 1970 and 1977, that it is aware of the issue and, therefore,

28

United States District Court

For the Northern District of California

1  that its decision not to amend section 844.6 to exclude the two state law provisions at issue here was

2  intentional.

3        Accordingly, the state law claims against the County are dismissed under California

4  Government Code section 844.6.[10]

5       **B.**      **Plaintiffs' Class Certification Motion**

6            **1.**      **Legal Standard Governing Class Certification**

7        In order to satisfy the requirements for class certification in Rule 23, plaintiffs must

8  demonstrate that they have satisfied the requirements set forth in subsection (a) as well as one of the

9  four possibilities in subsection (b).  Subsection (a) sets forth the following requirements for

10  certification:

11            (1) the class is so numerous that joinder of all members is
          impracticable, (2) there are questions of law or fact common to the
12            class, (3) the claims or defenses of the representative parties are
          typical of the claims or defenses of the class, and (4) the representative
13            parties will fairly and adequately protect the interests of the class.

14  Fed. R. Civ. P. 23(a).  Plaintiffs here seek class certification under Rule 23(b)(3), which allows a

15  class action to be maintained where the court finds that "the questions of law or fact common to the

16  members of the class predominate over any questions affecting only individual members, and that a

17  class action is superior to other available methods for the fair and efficient adjudication of the

18  controversy."  Rule 23(b)(3) instructs courts to consider the following factors in making this

19  determination:

20            (A) the interest of members of the class in individually controlling the
          prosecution or defense of separate actions; (B) the extent and nature of
21            any litigation concerning the controversy already commenced by or
          against members of the class; (C) the desirability or undesirability of
22            concentrating the litigation of the claims in the particular forum; (D)
          the difficulties likely to be encountered in the management of a class
23            action.

24  Fed. R. Civ. P. 23(b)(3).

---

25

26       [10] To the extent Plaintiffs allege that Defendants have violated their right to privacy under article I, section 1, of the California Constitution, that claim is asserted under the Unruh Civil Rights Act and the Bane Act (Calfornia Government Code sections 52.1(a) & (b)) and, therefore, is barred under
27  California Government Code section 844.6.  Because the Complaint does not assert a direct claim under the California Constitution, the Court need not consider whether California Government Code section
28  844.6 would bar such a claim.

Plaintiffs bear the burden of establishing that class certification is appropriate. *Zinser v. Accuflex Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). The court must conduct a "rigorous analysis" to determine whether the prerequisites of Rule 23 are met. *Id.* (citation omitted). "Because the early resolution of the class certification question requires some degree of speculation, however, all that is required is that the Court form a 'reasonable judgment' on each certification requirement." *In re Citric Acid Antitrust Litig.*, 1996 WL 655791 *2 (N.D. Cal. Oct. 2, 1996). In conducting this analysis, the court may properly consider both the allegations in the complaint and the evidence submitted by the parties. *Id.* (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

### 2. Numerosity

Rule 23(1) requires that the size of the proposed class be so numerous that joinder of all the class members is impracticable. There is no set number cut-off. *See Welling v. Allexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994) (noting that courts have certified classes as small as 14 and have often certified classes with 50-60 members). Here, Defendants have provided the following numbers regarding strip searches as Contra Costa County Juvenile Hall:

> Approximately 14700 juveniles were booked during the January 2000 through September 2005 time period. 3832 juveniles were booked for being in violation of offenses not involving violence, drugs, or weapons. From the 3832 juveniles, we then removed from the list: juveniles who had a prior history of violations involving violence, drugs, or weapons, juveniles booked on court commitments; warrants; home supervision violations; probation violations, had probation strip search clauses, juveniles transferred into the facility from another detention facility, juveniles who disclosed a history of drug use, suicide or mental health problems, and juveniles with a history of violence in schools or at detention facilities, leaving approximately 81 juveniles remaining who were strip searched at the time of their booking.

Fizgerald Summary Judgment Decl., Ex. M (Defendants' Second Amended Responses to Interrogatories, Response to Interrogatory 11). Thus, it is undisputed that Class One, directed at

United States District Court

For the Northern District of California

1    Defendants' intake strip search policy, contained at least 81 members.  The Court concludes that this

2    number is sufficient to satisfy the numerosity requirement as to Class One.[11]

3         With respect to Class Two, which includes juveniles arrested in Class One who were strip-

4    searched before and/or after visitation or court appearances, Plaintiffs assert that most of the 3,832

5    juveniles that Defendants concede were booked and housed at Juvenile Hall for offenses that did not

6    include drugs, weapons, or violence would have been subjected to the policy of strip-searching

7    juveniles in connection with visits and court appearances.  Even if Defendants take the position that

8    the number of individuals in Class One is much smaller than Plaintiffs' assert, they do not dispute

9    that these individuals would have been subjected to the practice of being strip-searched after court

10   appearances.  Therefore, the Court concludes that the numerosity requirement is satisfied as to Class

11   Two as well.

12        The Court rejects Defendants' assertion that the class members are not ascertainable because

13   so many individualized factual determinations must be made regarding class membership.  *See*

14   Defendants' Opposition to Class Certification Motion at 20 (citing *DeBremaeker v. Short*, 433 F.2d

15   733, 734-35 (5th Cir. 1970) for the proposition that numerosity requirement requires that the class be

16   ascertainable by reference to objective criteria).  It is apparent from the record that Defendants

17   maintain computerized records of juveniles admitted to Juvenile Hall and the charges on which they

18   were booked.  *See* Merin Class Certification Decl., ¶ 5.  These records will make a determination of

19   who is in the two classes relatively straightforward.

20              **3.      Common Questions of Law and Fact**

21        In order to satisfy the commonality requirement, Plaintiffs must demonstrate that there are

22   questions of law and fact that are common to the class.  Fed. R. Civ. P. 23(a)(2).  The Ninth Circuit

23   has explained that this requirement has been construed permissively and is less rigorous than the

24   requirements of Rule 23(b)(3).  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).

25   "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common

26   core of salient facts coupled with disparate legal remedies within the class."  *Id*.  Here, the core legal

27

28        [11]  In reaching this conclusion, the Court does not rule on whether the categories of individuals
     Defendants excluded from their list were properly excluded under Plaintiffs' class definition.

United States District Court

For the Northern District of California

issue is the lawfulness of policies that were applied to all juveniles detained by Contra Costa Juvenile Hall. This common legal issue is sufficient to meet the commonality requirement.

### 4.    Typicality

To satisfy the typicality requirement, Plaintiffs must establish that "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ. P. 23(a)(2). Again, the standard is permissive: "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id*. at 1020. Defendants assert that Ermitano's claims are not typical of the claims of the two classes Plaintiffs seek to certify for three reasons: 1) Ermitano was initially strip-searched, according to Defendants "as a result of having committed a crime involving violence drugs or weapons" and after her confinement, was strip-searched because of her history of "suicide, depression and drug use;" 2) Ermitano's account of her experience differs from that of all other individuals detained at Juvenile Hall to the extent that she asserts she was strip-searched not only after but also *before* visits and court appearances; and 3) Ermitano is not typical of the class because she has already reached the age of majority. The Court rejects Defendants' arguments except with respect to the pre-visitation strip searches, which the Court excludes from the definition of Class One.

Defendants' assertion that Ermitano was initially strip-searched as a result of having committed a crime involving violence, drugs or weapons does not withstand scrutiny. This assertion apparently is based on Ermitano's admission that she used a kitchen knife to cut a screen when she stole the keys to the car that she also stole. The Court finds that a crime of violence, at a minimum, requires some threat of physical harm to *another individual*. Use of a kitchen knife in an empty house to cut a screen does not make Ermitano's offense a crime of violence. Similarly, the kitchen knife itself does not constitute a weapon as Ermitano found the knife at the scene and used it only as a tool. Nor, as discussed above, does Ermitano's use of the kitchen knife support the conclusion that there was probable cause to strip-search Ermitano, as there is no evidence this information was ever conveyed to the individuals who conducted the strip searches (even assuming it would have been sufficient to establish probable cause). Rather, the evidence indicates that she was strip-searched as

United States District Court

For the Northern District of California

a result of Defendants' blanket policy of strip-searching juvenile detainees without reasonable suspicion.  That is the policy Ermitano and the proposed class members in Class One challenge.

Similarly, there is no evidence that the strip searches that were conducted while Ermitano was at Juvenile Hall were conducted  because of Ermitano's prior suicide attempt.  In particular, Defendants point to no evidence that this information was communicated to anyone who was involved in conducting (or deciding to conduct) these strip searches of Ermitano.  Again, the evidence in the record indicates that Ermitano was strip-searched as part of a blanket policy or practice.[12]

The Court also rejects Defendants' assertion that Ermitano is not typical of the rest of the class because she has reached majority already and therefore no longer faces the possibility of being strip-searched as a juvenile detainee at Juvenile Hall.  This argument is essentially the same as the argument raised on summary judgment with respect to Plaintiffs' injunctive relief claim.  For the reasons set forth above, the Court rejects Defendants' argument here.

The Court does find that both Class One and Class Two may include plaintiffs whose claims are not typical of Ermitano's to the extent the class period is defined only in terms of the plaintiffs' ages.  As a result, the proposed classes include plaintiffs who were strip-searched after the change in policy that was instituted on September 15, 2005.  As Plaintiffs have conceded that they have no evidence regarding the implementation of the new policy, the Court concludes that the class period should be modified to include an additional limitation requiring that class members must have been subjected to strip searches at Juvenile Hall prior to September 15, 2005.

In addition, the Court concludes that Class Two is overbroad to the extent it includes individuals who were subjected to strip searches *before* visits and court appearances.  Plaintiffs have pointed to no evidence that any other plaintiff in the class was subjected to such searches and

---

[12]   The Court notes that in balancing the extent of the intrusion against the nature of governments' interest in conducting the challenged strip search policies, the risks that juvenile detainees may attempt to harm themselves or others will be a significant consideration.  There is no doubt that past suicide attempts by detainees are relevant to this inquiry.  Defendants, however, have pointed to no evidence that Ermitano's one past suicide attempt makes her atypical of juveniles detained for crimes that do not involve violence, drugs, or weapons.  Rather, the evidence in the record suggests that juveniles detained at Juvenile Hall are, on the whole, more likely to suffer from undiagnosed trauma that makes suicide attempts more likely than is the case for the general population of juveniles.

**United States District Court**

For the Northern District of California

Defendants have cited evidence that this was not the practice at Juvenile Hall.  Although Ermitano's claims need not be identical to those of the class, in the absence of evidence that Ermitano's challenge to strip searches conducted prior to visits and court appearances is shared by the rest of class, the Court finds it appropriate to exclude from the definition of Class Two the words "before and/or."  With these modifications, the Court concludes that the typicality requirement is met.

### 5.    Adequacy of Representation

Defendants assert that Ermitano will not adequately represent the class because her claims fail on the merits and therefore, she lacks standing to assert the claims of the class.  In particular, Defendants assert that the strip searches Ermitano was subjected to were constitutional and that she does not have standing to seek injunctive relief.  These arguments are the same as the ones that the Court has already rejected in connection with Defendants' Summary Judgment Motion.  Further, Plaintiffs have offered evidence that their counsel have extensive class action experience, including cases that involve challenges to blanket strip search policies like the one in this case.  *See* Declaration of Mark E. Merin in Support of Plaintiffs' Motion for Class Certification ("Merin Class Certification Decl."), ¶¶ 7-12.  Accordingly, the Court concludes that Ermitano is an adequate class representative.

### 6.    Rule 23(b)(3) Requirements

To qualify for class certification, Plaintiffs must also satisfy the requirements of Rule 23(b)(3).  "To qualify for certification under this subsection, a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions must 'predominate over any questions affecting only individual members,' and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Hanlon v. Chrysler Corp.*, 150 F.3d at 1022.  The predominance test of Rule 23(b)(3) is more "far more demanding" than the commonality test under Rule 23(a)(1).  *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

Defendants assert that the predominance test is not met  – and, therefore, the class mechanism is not superior to other methods of resolution – because the claims of the class members will require individualized determinations on a variety of issues, including: 1) whether the individual plaintiffs' claims are barred under the *Rooker-Feldman* doctrine, *Younger* abstention, or the doctrine

United States District Court

For the Northern District of California

of collateral estoppel; 2) the juveniles' prior history, which might give rise to reasonable suspicion as to some of the plaintiffs and render the strip searches constitutional; and 3) the damages each plaintiff may recover.  The Court rejects these arguments.

### a. *Rooker-Feldman* Doctrine, *Younger* Abstention, and Collateral Estoppel

Defendants' reliance on various doctrines that prohibit this Court from overturning or interfering with state court judgments and require the Court to give preclusive effect to issues that have already been decided in state court is misplaced.

As discussed above, under *Younger v. Harris*, federal courts must not interfere with ongoing state criminal prosecutions unless there is a threat of "great and immediate injury."  401 U.S. at 36. Similarly, the *Rooker-Feldman* doctrine precludes a litigant in federal court from trying to "undo a prior state-court judgment" or ruling.  *Bianchi v. Rylaarsdam*, 334 F.3d 895, 901 (9th Cir. 2003). For example, in *Wishnefsky v. Addy*, 969 F. Supp. 953 (E.D. Pa. 1997), cited by Defendants, the plaintiff brought a federal civil rights action based on allegedly unconstitutional search where he had raised the same constitutional challenge in the state court criminal proceeding in the context of a motion to suppress evidence the prosecution sought to introduce against him.  The state court had denied the motion to suppress, ruling that the search was proper.  *Id*. at 955.  On the basis of the state court ruling, the district court dismissed Wishnefsky's civil rights claims on the basis that they were barred under the *Rooker-Feldman* doctrine. *Id*.  Finally, under the doctrine of collateral estoppel, parties may not relitigate an issue that has already been litigated and decided by another court.  *See Migra v. Warren City Sch. Dist. & Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984).

Here, Defendants have not pointed to any instances in which contraband discovered as the result of a strip search was used as a basis for bringing state law criminal charges against a juvenile or where the constitutionality of the search was challenged or is the subject of a challenge in any ongoing state court action.  Nor have they provided evidence that any plaintiff in the proposed classes has been the subject of a state court ruling on the same constitutional issues as are raised here.  Thus, the possibility that the claims of a plaintiff in the proposed classes might fall under any of the three doctrines discussed above is entirely speculative.

**United States District Court**
For the Northern District of California

**b.   Prior History and Reasonable Suspicion**

Defendants point to a variety of factual inquiries that they assert will require individualized inquiry, including whether at the time of the strip search or searches the juvenile had previously been booked for crimes involving drugs, violence, or weapons, whether the juvenile was subject to a probationary search term, whether the juvenile had a history of suicide or mental health problems, whether the juvenile had a history of violence in school or in a detention facility and whether the juvenile was transferred from another facility.  While some courts have accepted this argument as a basis for denying class certification, *see, e,g., Doe v. Connecticut*, Case No. C00-2036, slip op. at *8 (D. Conn. September 27, 2002), other courts, including two in this district, have rejected such arguments.  *See Mary Bull v. City and County of San Francisco*, Case No. C03-1840, slip. op. (N.D. Cal. June 10, 2004); *Gallagher v. County of San Mateo*, Case No. C-04-2448 (N.D. Cal. Oct. 28, 2005); *see also Tardiff v. Knox County*, 365 F.3d 1, 7 (1st Cir. 2004); *Maneely v. City of Newburgh*, 208 F.R.D. 69, 78 (S.D.N.Y. 2002); *Mack v. Suffolk County*, 191 F.R.D. 16, 23 (D. Mass. 2000).

In *Mary Bull*, the plaintiffs challenged an alleged policy on the part of the Sheriff's Department of conducting strip searches on arrestees charged with a crime involving drugs, weapons or violence and arrestees with a criminal history involving drugs, weapons or violence. Slip op. at 2. The policy also allowed arrestees to be strip-searched if they were placed in safety cells, which could occur under a wide array of circumstances, including if the arrestee "displays bizarre behavior" or if the arrestee requests to be placed in the safety cell. *Id.*  Plaintiffs sought to certify a class of individuals who were arrested "on any charge not involving weapons, controlled substances, or a felony charge of violence, and not involving a violation of parole or a violation of probation (where consent to search is a condition of such probation)." *Id.* at 8.  Defendants argued that the class should not be certified because the common issues in the case did not predominate, asserting that the question of whether reasonable suspicion existed as to each plaintiff would require an individualized inquiry. *Id.* at 9.

The court in *Mary Bull* rejected Defendants' position.  It held that the legality of the defendants' strip search policy or practice – the nature of which was undisputed – was the predominant issue in the case, even if it might be necessary to make some individualized

1  determinations regarding the existence of facts that would have given rise to reasonable suspicion.

2  The court pointed out that to the extent any individuals were actually strip-searched based on

3  individualized reasonable suspicion, those individuals would not be included in the class.  *Id*. at 11.

4  Further, even if post hoc determinations of reasonable suspicion were required  – a question the

5  court declined to rule on – "that does not mean that an individual was not searched pursuant to a

6  blanket visual body cavity strip search, the constitutionality of which will be determined in this

7  litigation."  *Id*.  The court also noted that the exclusion of individuals charged with crimes involving

8  weapons, drugs and violence (the court amended the class definition to exclude misdemeanors where

9  violence was used as well as felonies) would reduce the problem.  *Id*. at 10.  And to the extent that

10  there was a policy of conducting strip searches without individualized reasonable suspicion, the

11  court reasoned, the number of individuals "as to whom defensible individual judgments to strip

12  search were actually made or could have been made," such persons "may well not be numerous."

13  *Id*. at 11 (quoting *Tardiff*, 365 F.3d at 6).  Finally, the court reasoned that even if some categories of

14  individuals within the class could be permissibly strip-searched, some of these determinations too

15  could be resolved on a class-wide basis.  *Id*. at 10.

16        The Court finds the reasoning in *Mary Bull* to be persuasive.  The core issue of whether the

17  policies and practices relating to strip searches at Contra Costa Juvenile Hall prior to September 15,

18  2005, were lawful is the predominant issue that binds the class together in this case and is sufficient

19  to satisfy the requirements of Rule 23(b)(3).  Nonetheless, the Court concludes that Plaintiffs'

20  proposed classes should be narrowed to eliminate certain categories of individuals whose claims are

21  more likely to raise separate issues.  In particular, the Court narrows Class One to exclude the

22  following categories of individuals: 1) juveniles with a prior history of being booked on offenses

23  involving drugs, weapons, or violence; 2) juveniles who were subject to parole or probationary

24  search conditions at the time of the strip search; and 3) juveniles who were transferred from another

1   detention facility and, thus, were not under the constant supervision of a Contra Costa County

2   employee.[13]

3                              **c.      Damage Determinations**

4          Defendants assert that damage determinations are likely to differ as between plaintiffs

5   because the impact of the strip searches on the individual plaintiffs will diverge widely.  Assuming

6   this is true, the Court does not find that this fact is sufficient to defeat a finding of predominance.  As

7   the court in *Tardiff* noted, "the need for individualized damage decisions does not ordinarily defeat

8   predominance where there are still common issues as to liability."  365 F.3d at 6.  In particular, if the

9   class action resolves liability only, this is a legitimate function.  *Id*. at 6-7.  Once the question of

10  liability is resolved, the issue of damages can be resolved in a variety of ways.  *Id*. at 7.  If no

11  solution is found to resolve the damages of the class members, the court even has the option of

12  entering a judgment of liability and allowing the class members to bring separate actions for

13  damages.  *Id*.  The Court concludes that the possible divergence among plaintiffs in the proposed

14  classes is not sufficient to defeat class certification.

15  **IV.     CONCLUSION**

16         The Court DENIES Defendants' Summary Judgment Motion as to Claim One, based on

17  Defendants' alleged violation of the Fourth Amendment.  The Court further DENIES Defendants'

18  Summary Judgment Motion as to Plaintiffs' request for injunctive relief.  The Court GRANTS

19  Defendants' Summary Judgment Motion as to the state law claims (Claims Two and Three) against

20  the County.

21         Plaintiffs' Class Certification Motion is GRANTED.  Accordingly, the Court certifies the

22  following classes:

23         Class One: All juveniles admitted and housed at Contra Costa County Juvenile Hall during

24         the class period who were strip-searched at intake pursuant to defendants' blanket policy and

25         practice of strip-searching all such juveniles prior to their detention hearings, except for: 1)

26         those who were strip-searched at intake after being admitted for an alleged violation (felony

27

28         ───────────────────────

                [13]   The Court notes that at oral argument, Plaintiffs' counsel conceded that the categories of
           individuals carved out by Defendants in determining the size of the potential class were "generally
           reasonable."

or misdemeanor) involving violence, drugs, or weapons; 2) those who were strip-searched at intake because of a reasonable suspicion that such strip search would be productive of contraband; 3) those who had a prior history of being booked on offenses involving drugs, weapons, or violence; 4) those who were subject to parole or probationary search conditions at the time of the strip search; and 5) those who were transferred from another detention facility and thus were not under the constant supervision of a Contra Costa County employee.

Class Two: All juvenile arrestees in Class One who were strip-searched after visits or court appearances, prior to the detention hearing, during the class period.

The class period for both classes shall be defined as "all persons who are currently juveniles or who reached the age of majority within two years of filing this action and who were subjected to a strip search at Contra Costa County Juvenile Hall before September 15, 2005." *Id.*

The parties shall meet and confer and submit to the Court a joint proposed class notice consistent with this opinion within thirty (30) days of the date of this Order.

IT IS SO ORDERED.

Dated: December 5, 2007

JOSEPH C. SPERO
United States Magistrate Judge